**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,**  Plaintiff,  v.  **Timothy J. Pentaleri,**  Defendant. | **Criminal No. 07-298 (PAM/JJG)**  **REPORT AND RECOMMENDATION** |

JEANNE J. GRAHAM, United States Magistrate Judge

The above-entitled matter came before the undersigned Magistrate Judge on October 29, 2007 for the pretrial motions of defendant Timothy Pentaleri. Erica H. MacDonald, Assistant United States Attorney, appeared on behalf of the Government. Joseph P. Tamburino, Esq., appeared on behalf of Mr. Pentaleri (Pentaleri).

Through a motion to suppress (Doc. No. 17), Pentaleri raises several arguments. He first contends that officers lacked reasonable, articulable suspicion to initiate an investigatory stop. He also challenges an investigatory frisk during the stop, arguing that officers had no reasonable, articulable suspicion he was armed. And he challenges the duration of the stop, claiming that it ripened into an arrest, but that officers lacked probable cause to arrest him. Pentaleri also argues that officers took a statement from him in violation of his privilege against self-incrimination. These motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1(c).

## I.  BACKGROUND

This prosecution arises out of events at the Minneapolis-St. Paul International Airport on the evening of June 29, 2007.  Jeff Kolesar, a community service officer with the Minneapolis Airport Police, was on patrol in the baggage claim area.  In the concourse, he observed a man dressed in a jacket and full-length pants, with long hair tucked beneath a baseball cap.  Kolesar found this attire unusual.  It had been a hot day, and though the airport is air conditioned, the baggage claim area was quite warm.  And most others at the airport were dressed in shorts or short-sleeve shirts.

The man made eye contact, put his hands in his pockets, and walked away from Kolesar.  Although the man briefly walked out of sight, Kolesar found him standing by a pillar adjoining one of the exits.  Kolesar believed the man was looking around nervously.

At that point, an airport patron asked Kolesar for assistance, causing him to look away for a moment.  When Kolesar looked back around five seconds later, the man was crouching and facing away, talking at a public telephone.  Kolesar also thought this strange:  it seemed unlikely for the man to reach the phone, pay for the call, dial a number, and start conversation in that amount of time.

Kolesar radioed airport police and advised there was a suspicious person.  He made this dispatch shortly after 9:45 p.m.  Officer Roby Desuibijana, joined by another member of the Minneapolis Airport Police, responded to the dispatch.  In this time, the man moved to one of the exits, standing in the vestibule between two sets of automatic glass doors.  Kolesar indicated to Desubijana where the man was.

Desubijana then made eye contact with the man, who exited and walked north along the adjoining sidewalk.  According to Desubijana, there was no access to ground transportation or

parking ramps in that direction. Aside from reentering the baggage claim, the only destination in that area was a parking lot for airport police.

After a moment, the man turned around and starting walking back toward the officers. As the man approached, Desubijana realized the man was wearing a wig and a fake moustache and goatee. The officers told the man to stop and asked for identification. The man provided a drivers license, and officers determined the man was Timothy Pentaleri.

They then asked Pentaleri why he was wearing the wig, moustache and goatee. Pentaleri responded that he was at the airport to surprise some friends. At that time, Pentaleri removed the wig, moustache, and goatee and threw them into a nearby garbage can.

During the encounter, Desubijana directed Pentaleri to take his hands out of his pockets. Pentaleri briefly complied, but when he put his hands back, Desubijana told him again. After a third warning, Desubijana ordered Pentaleri to place his hands on the garbage can and conducted a pat-down search. Desubijana found a knife, a stun gun, an expandable baton, and three cans of pepper spray.

Desubijana asked Pentaleri why he was carrying weapons. Pentaleri responded that he was concerned about his safety. Desubijana then asked Pentaleri why he was at the airport, and Pentaleri said that he had never been to Minneapolis and—contrary to his prior statement—that he simply wanted to "check out" the airport. The officers handcuffed Pentaleri, informing him that he was not under arrest, and moved him to a holding cell.

After the move, the officers removed the handcuffs and performed a more careful search of Pentaleri's person, based on concern that he might harm himself. Among the items they found was a key for a rental car and a key for a GMC vehicle. The officers again informed Pentaleri that he was not under arrest. Other officers contacted the Federal Bureau of Investigation (FBI)

and advised that a suspicious person had been detained. A special agent from the FBI arrived shortly afterwards.

The agent gave Pentaleri a *Miranda* warning and asked him whether he wanted to talk. Pentaleri said he wanted to talk to "somebody else," or to his father, and that he did not want to talk to law enforcement. Pentaleri then said that he wanted an attorney, and he made several attempts to call an attorney on his telephone, without success. Next he called his father. After reaching him, Pentaleri gave the telephone to Desubijana, who spoke to Pentaleri's father at some length.

Based on this conversation, Desubijana was still concerned about whether Pentaleri might harm himself or someone else, so he resumed questioning of Pentaleri. Desubijana again asked Pentaleri why he was at the airport, and this time, Pentaleri said that he "might be here to scare a girl." Desubijana also noted the key to the rental car and asked Pentaleri how he got to the airport. Pentaleri said that the rental car was at his residence in Illinois, and he gave inconsistent answers about how he got to the airport.

Desubijana concluded that he had no further reason to hold Pentaleri at the airport. At approximately 1:30 a.m., more than three hours after Pentaleri was initially stopped, Desubijana issued Pentaleri a warning against trespassing at the airport. Desubijana then transported him to a nearby hotel. At that hotel the next day, hotel management advised Desubijana that Pentaleri had checked out. Pentaleri left his jacket behind, and Desubijana located it at the lost and found. Desubijana took the jacket and found the rental car key and a pair of gloves in the pockets.

In the meantime, the investigation of Pentaleri was separately pursued by Officer Michael Seelig, also of the Minneapolis Airport Police. After learning about the other officers' encounter with Pentaleri, Seelig reviewed video surveillance from that timeframe, and then started tracing

4

backwards to see how Pentaleri arrived. Seelig ultimately traced Pentaleri to a certain area of the short term parking ramp, but was unable to determine whether Pentaleri arrived in a particular vehicle.

Seelig went to that portion of the parking ramp on foot and surveyed the vehicles there. One was a red GMC Jimmy. But when Seelig checked the rear license plate, a Minnesota plate, it was registered to a white pickup truck. Seelig then noticed the front plate was a non-matching plate from Illinois. Another officer later confirmed the Minnesota plate was stolen from another vehicle.

Through the windows of the vehicle, Seelig saw rope, a shovel, duct tape, a duffel bag, nylon zip ties, boxes of plastic bags, and large sheets of plastic tarp. After Seelig reported this discovery to his superiors, the Jimmy was placed under surveillance.

At approximately 5:30 a.m. the next morning, Pentaleri went to the Jimmy and drove out of the parking ramp. Officers stopped Pentaleri before he left the airport. He was arrested and the Jimmy was impounded. Officers later obtained a search warrant for the Jimmy. When the warrant was executed, they found the items that Seelig viewed beforehand, along with other suspicious items.

## II. ANALYSIS

### A. Basis for Investigatory Stop

Pentaleri argues that officers had no basis to initiate the initial investigatory stop outside the baggage claim. Such a stop, in accordance with the Fourth Amendment, must be founded on

officers' articulable, reasonable suspicion that the person is engaged in criminal activity.[1] *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006).

When evaluating whether such suspicion is present, a court considers whether particular facts, in the totality of the circumstances, supply objective grounds for the stop. This assessment may include observations an officer makes as a result of experience and training. *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006).

Evasive conduct, together with other facts that corroborate criminal activity, may supply reasonable, articulable suspicion for a stop. *See United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998); *see also United States v. Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990) (avoidance of airport security).

Pentaleri first came to the attention of officers due to his unusual attire. Perhaps this fact, by itself, is not enough to rouse suspicion. But his ensuing conduct plainly demonstrated a desire to avoid the attention of police. That conduct, moreover, was not consistent with the behavior of one waiting for baggage, or one waiting to pick up someone else from the airport. Officers could infer, at a minimum, that Pentaleri was hiding contraband.

The disguise was also cause for concern. For instance, an officer may reasonably infer that Pentaleri was contemplating a theft or assault, and he did not want to be easily recognized.

In these circumstances, the officers had ample cause for reasonable, articulable suspicion. The ensuing investigatory stop was within the bounds of the Fourth Amendment, and evidence from the stop need not be suppressed.[2]

---

[1] The parties devote some discussion to whether the initial encounter was a seizure for which reasonable, articulable suspicion was required. As this Court ultimately concludes reasonable suspicion was present, a seizure was justified, and so it is not necessary to determine whether or not a seizure occurred.

6

**B.     Investigatory Frisk**

Pentaleri also contends that, once officers commenced the stop, they did not have reason to conduct a pat-down search.  The controlling question here is whether, during the investigatory stop, officers had authority under the Fourth Amendment to conduct an investigatory frisk.  This sort of limited search of a person is permitted, for the purpose of locating weapons, where an officer has reasonable, articulable suspicion that a person may be armed and dangerous.  *United States v. Garcia*, 441 F.3d 596, 599 (8th Cir. 2006).

Such suspicion may arise where a person refuses to keep his or her hands visible during a police encounter.  *United States v. Cornelius*, 391 F.3d 965, 967-68 (8th Cir. 2004).  A related consideration is whether the person is wearing attire that has the potential to conceal a weapon.  *See United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir. 1989).  An investigatory frisk can be justified by officers' reasonable concerns about their safety.  *See United States v. Walker*, 494 F.3d 688, 693 (8th Cir. 2007).

The record shows Pentaleri was wearing a long jacket, not appropriate to the weather, where a weapon could be concealed.  And Pentaleri failed to obey repeated instructions to keep his hands out of his pockets.  In such circumstances, the officers acquired reasonable, articulable suspicion that Pentaleri may be armed and dangerous.  For their safety and that of other airport patrons, they had authority to conduct an investigatory frisk.

---

[2] Based on the fact that Pentaleri removed his wig, moustache, and goatee and threw them in the garbage, the Government contends that he abandoned this evidence and thus cannot challenge its seizure by law enforcement.  Pentaleri does not specifically address this argument.  But it is well established that, if a defendant places items into public garbage, then that person relinquishes any reasonable expectation of privacy in those items and law enforcement may then seize them.  *See United States v. Trice*, 864 F.2d 1421, 1423-24 (8th Cir. 1988).

7

### C.     Duration of Investigatory Stop

Pentaleri next argues that, if the original investigatory stop was permitted, he was held so long that the encounter ripened into an arrest. He accordingly contends that, at that time, officers lacked probable cause to arrest him.

The threshold issue is whether the investigatory stop ripened into an arrest. The Fourth Amendment requires that investigatory stops be limited in scope, meaning the investigation is related to the circumstances that justified the stop. *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007). To establish that the duration of the stop is unreasonable, the inquiry is whether the encounter was so long or so intrusive that it amounts to an arrest. *United States v. Maltais*, 403 F.3d 550, 556-57 (8th Cir. 2005).

No rigid rule controls the duration of a stop, and depending on the circumstances, hours may be justified. *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007). A key concern is whether officers pursued the investigation with due diligence. *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)). Some reasonable delay may be permitted where investigatory resources cannot be immediately at hand. *See Donnelly*, 475 F.3d at 953 (ninety minute delay to obtain drug dog); *Maltais*, 403 F.3d at 557-58 (three hour delay to obtain drug dog).

Perhaps the most instructive case with comparable circumstances is the plurality opinion of the U.S. Supreme Court in *Florida v. Royer*. 460 U.S. 491 (1983). In that case, the defendant was initially stopped in the public concourse of an airport. On suspicion of drug smuggling, officers then took the defendant to a holding cell, where he was held for some time while his luggage was searched. The Court observed, among other things, that lengthy detention in a holding cell was not justified where the defendant evidently did not threaten public safety. It

concluded that the investigatory stop was sufficiently intrusive to have ripened into an arrest.  *Id.* at 501-04.

Once officers discovered that Pentaleri had weapons, they acquired ample concern about public safety, giving them reason to remove him from the public baggage claim area to a secure holding cell.  When the original grounds for suspicion and the weapons are considered together, officers also had substantial reason to continue the stop and pursue their investigation further.

The ensuing encounter, however, was not brief.  Pentaleri was kept in holding for more than three hours; this delay cannot be entirely explained by officers' diligent efforts to pursue their investigation.  Even though the original stop was justified, both the duration of the stop, and the degree of the intrusion, indicate that it may have ripened into an arrest.

Assuming for the sake of argument that Pentaleri was arrested, the question then becomes whether the arrest was supported by probable cause.  Consistent with the Fourth Amendment, an officer may not arrest a person without a warrant unless that officer has probable cause to do so.  Probable cause exists where, according to the facts and circumstances known to law enforcement at the time of the arrest, a prudent person would believe that a suspect had committed or is committing a crime.  *United States v. Adams*, 346 F.3d 1165, 1169 (8th Cir. 2003).

As the Government indicated, wearing a disguise in public is a crime, subject to limited exceptions.  *See* Minn. Stat. § 609.735.  So the disguise, by itself, would be enough to support a reasonable belief that Pentaleri committed a crime.  Even if the disguise was not enough, when it is taken with the fact that Pentaleri was substantially armed and moving surreptitiously through the airport, a reasonable person might also believe that an attempted assault or kidnapping was in progress.  *Cf. Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996) (concluding that

9

where suspect attempted to lure child into car, and officers obtained description of suspect and car, there was probable cause to arrest for attempted kidnapping).

Assuming the investigatory stop did ripen into an arrest, there was nevertheless probable cause for officers to do so here. The duration of the investigatory stop, therefore, is not reason to suppress evidence from the stop.

**D.    Statements**

Pentaleri also seeks suppression of statements, focusing on those he made to Desubijana after he was transported to the holding cell.[3] The violation here, Pentaleri argues, is that officers took his statements in violation of his privilege against self-incrimination. Pursuant to this Fifth Amendment privilege, when a suspect is taken into police custody, that suspect must receive a *Miranda* warning before being subject to police interrogation. *See United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005).

The initial issue here is whether Pentaleri was in custody. This occurs when a defendant is formally arrested or is restrained to a degree comparable to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). To decide whether restraint is comparable to formal arrest, the issue is whether a reasonable person, under similar circumstances, would understand the situation to be an arrest. *United States v. Martinez*, 462 F.3d 903, 908-09 (8th Cir. 2006).

In *United States v. Griffin*, the Eighth Circuit developed a nonexclusive six-factor test for evaluating whether a defendant is in custody. 922 F.2d 1343 (8th Cir. 1990). These factors are (1) whether the defendant was informed that questioning was voluntary and that the defendant was free to leave; (2) whether the defendant had freedom of movement during questioning; (3) whether the defendant initiated contact with authorities or voluntarily acquiesced to questioning;

---

[3] Although Pentaleri also made statements to officers in the initial encounter outside the baggage claim, he does not challenge them here.

(4) whether officers employed coercive or deceptive tactics during questioning; (5) whether the atmosphere of questioning was dominated by the officers; and (6) whether the defendant was arrested after questioning. *Id.* at 1349. The first three factors support a finding the defendant was not in custody; the remaining three support a finding the defendant was in custody. *Id.* at 1349.

Recent decisions of the Eighth Circuit criticize use of the *Griffin* factors for determining custody. These decisions warn against formulaic application of the *Griffin* factors, and instead emphasize scrutiny of the facts of each particular case. *See, e.g., United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006). But other recent Eighth Circuit decisions continue to examine the factors. *See, e.g., United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007).

Because the questioning occurred during an investigatory stop, this issue merits further comment. Some Eighth Circuit authorities suggest that, because an investigatory stop ordinarily involves less restraint than a formal arrest, the suspect is not in custody. *See United States v. Moore*, 98 F.3d 347, 351 (8th Cir. 1996). But in its recent decision of *United States v. Martinez*, the Eighth Circuit set out a more nuanced approach. If a suspect is sufficiently restrained during an investigatory stop, the suspect may be in custody for the purposes of the privilege against self-incrimination, even though the suspect is not formally arrested. 462 F.3d 903, 909-10 (8th Cir. 2006).

So the fact of an investigatory stop, by itself, does not necessarily have significance. As in any other case, it is appropriate to consider the totality of the circumstances. *See United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). If greater restraints were used during the stop, that concern is certainly relevant to whether a suspect is in custody.

When officers transported Pentaleri to the cell, officers placed him in handcuffs, though they were removed after he reached the cell. Officers conducted a second search of his person after he reached the cell. Although Desubijana often emphasized to Pentaleri he was not under arrest, it is also implicit that he was not free to leave the cell.

There is no indication that officers used any coercive or deceptive tactics at this stage of the encounter. But it is plain that officers controlled the encounter, and that Pentaleri had little, if any, freedom to leave. A reasonable person, in the same circumstances, would have understood the situation to be an arrest.

When an officer tells a suspect that she or he is not under arrest, that fact weighs against a finding of custody. But such a statement is not determinative of whether a person is in custody, which ultimately depends on the degree to which the suspect is restrained. Though Desubijana made such statements here, they are not enough to alter the character of the encounter, making it less than custody. *See United States v. Ollie*, 442 F.3d 1135, 1137-38 (8th Cir. 2006).

Given that Pentaleri was in custody, the record shows that he received and understood a *Miranda* warning. Pentaleri said he did not want to talk to law enforcement, and he then spent some time attempting to contact a lawyer. In these circumstances, there is little reason to dispute that Pentaleri invoked, consistent with his Fifth Amendment privilege against self-incrimination, his right to remain silent and his right to counsel.

Because Pentaleri invoked his privilege against self-incrimination, the remaining issue is whether officers scrupulously honored the privilege by ceasing interrogation. Before resuming interrogation or seeking a waiver of the privilege, the officer must allow a reasonable amount of time to pass and must supply another *Miranda* warning, among other limitations. *See United States v. Cody*, 114 F.3d 772, 775 (8th Cir. 1997).

It may be inferred that, while Pentaleri was attempting to procure counsel, officers ceased interrogation. But after this effort proved fruitless, Desubijana resumed questioning, evidently without another *Miranda* warning. There is no indication, moreover, that Pentaleri invited such questioning or intended to relinquish his rights. Because his prior invocation of the privilege was not scrupulously honored, his statements in the holding cell are appropriately suppressed.

Anticipating this outcome, the Government relies on the public safety exception. Under this exception, an officer need not give a *Miranda* warning, and may pursue further questioning where it is "reasonably prompted by a concern for the public safety." *United States v. Quarles*, 467 U.S. 649, 656 (1984).

This exception usually applies in circumstances where a suspect has stored or abandoned dangerous evidence that may pose a threat to officers or to the general public. *See, e.g., Quarles*, 467 U.S. at 657 (question about location of missing firearm); *United States v. Luker*, 395 F.3d 830, 833-34 (8th Cir. 2005) (question about dangerous items in car); *United States v. Williams*, 181 F.3d 945, 953-54 (8th Cir. 1999) (question about dangerous items in apartment).

The record shows that Desubijana was concerned about whether Pentaleri would harm himself or others. But because Pentaleri was unarmed and in custody, the threat he posed to public safety had ended. Desubijana's questioning did not fall within the scope of the public safety exception,[4] so this exception does not save Pentaleri's statements from suppression here.

This Court certainly recognizes, from Pentaleri's past conduct, that he may pose a future threat to public safety. But this concern cannot by itself supply reasonable grounds for the public safety exception. Any person suspected of a violent crime may be deemed to pose a future threat

---

[4] This Court does not doubt that, when Desubijana resumed questioning, he was motivated by a good faith concern about the safety of others. But no matter how laudable this concern, the admissibility of Pentaleri's statements must be decided in accordance with authorities governing the privilege against self-incrimination.

the public.  If the public safety exception were applied to all such suspects, it would effectively bypass the protections of *Miranda* in many cases.  With this rationale in mind, the public safety should not be expanded to reach the circumstances presented here.

## III.     CONCLUSION

Because officers had reasonable, articulable suspicion to stop Pentaleri, evidence from the investigatory stop need not be suppressed.  The officers also acquired reasonable, articulable suspicion Pentaleri was armed and dangerous, so they had authority to conduct an investigatory frisk as well.  Assuming that the investigatory stop was so lengthy or intrusive to be an arrest, that arrest was supported by probable cause.

When officers questioned Pentaleri in the holding cell, he was sufficiently restrained to be in custody.  Pentaleri invoked his privilege against self-incrimination, but afterwards, officers did not scrupulously honor it.  So his ensuing statements were taken in violation of the privilege.

In accordance with this analysis, this Court concludes that Pentaleri's motion to suppress should be granted in part and denied in part.

## IV.     RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Pentaleri's motion to suppress (Doc. No. 17) be **GRANTED IN PART AND DENIED IN PART.**

2. All statements that Pentaleri made while in the holding cell be suppressed.

Dated this 20th day of November, 2007.

                                             s/ Jeanne J. Graham
                                             JEANNE J. GRAHAM
                                             United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **November 30, 2007**. Pursuant to the parties' representations at the motion hearing, the parties have waived their right to submit responses to these objections. Any objections shall not exceed 3,500 words. The district court judge shall review those portions of this report and recommendation to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.